```
FILED ___ LODGED
___ RECEIVED ___ COPY
      APR 0 6 2012
CLERK U S DISTRICT COURT
  DISTRICT OF ARIZONA
BY_____ DEPUTY
```

1  Gerald Nydam
2  416 N Berry
3  Winslow Arizona 86047
4  360 914 1611
5  Nook1955@yahoo.com
6  Pro Se

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Gerald Nydam | ) | |
|---|---|---|
| Plaintiff. | ) | Case No.  CV 12-8066-PCT-GMS |
| Vs. | ) | |
| Winslow Ford Inc | ) | Complaint and demand for jury trial |
| Defendant | ) | |

Parties

Plaintiff Gerald (Jerry) Nydam, as and for his claims for relief against defendant. Winslow Ford Inc. ("Winslow Ford") alleges as follows:

1. Plaintiff is an individual residing in Navajo county.

2. Defendant is an Arizona company operating in Navajo County.

Jurisdiction

3. This court has jurisdiction over this action pursuant to 28 U.S.C 1331 as it arises under the laws of the United States.

4. Winslow Ford is subject to personal jurisdiction in this district as it regularly does business in Navajo county, in the state of Arizona.

5. Venue in this District and the Prescott division is under 28 U.S.C 1391 (c), proper, as the events complained of occurred in Navajo County.

Complaint

Violation of the Fair Labor Standards Act. FLSA 29 U.S.C 201

6. Winslow Ford Inc. is an auto dealership in Navajo county, a county in the state of Arizona, Winslow Ford distributes and retails vehicles for Ford Motor Company a company out of the state of Arizona.

7. Winslow Ford sells automobile warranties thru various companies many of which are out of the state of Arizona.

8. The dealership also services automobiles and sells automobile parts which many are acquired thru vendors outside of the state of Arizona.

9. Winslow Ford then is engaged in interstate commerce and is thus subject to the Fair Labor Standards Act as described in 29 U.S.C 203 (b).

10. Gerald (Jerry) Nydam has 30 years' experience in the automobile repair and parts business including 12 plus years managing automobile dealership service departments.

11. Mr. Nydam was hired by Winslow Ford in January of 2009 to manage the dealership's service department.

12. Winslow Ford agreed to pay Mr. Nydam a salary of 5400.00 per month on a bi-weekly basis.

13. Mr. Nydam was classified as an exempt employee, meaning exempt from overtime as described in Title 29 part 541.102 the code of federal requirements as management.

14. An exempt employee must be paid the same predetermined amount at regular intervals with few exceptions these exceptions are listed Per title 29 Part 541 of the code of federal regulations 541.602 (b).

15. Mr. Nydam started his employment with Winslow Ford January 5, 2009.

16. On January 12, 2009 a memo came out to all the dealerships owned by the corporation that in short stated,

*Any errors committed in a manager's department would be deducted from the managers pay*.

17. Mr. Nydam for some reason did not see this memo.

18. This memo or attempt at policy is in violation of the code of federal regulations 29 part 541 subpart G 541.602 (a) which reads *an employee will be considered paid on a salary basis within the meaning of these regulations if the employee receives each pay period on a weekly or less frequent basis, a predetermined amount constituting all or part of the employees compensation which amount is not subject to reduction because of variations in the QUALITY or quantity of the work performed*

19. A month later on February 17, 2009 an e-mail came out that stated * Any employee whether salaried or hourly that does not clock in or out for work would not be paid for that day*

20. This e-mail is again in violation of title 29 part 541 Subpart G 541.602 (a), Which reads as follows * An employee will be considered to be paid on a salary basis within the meaning of these regulations if the employee regularly receives each pay period on a weekly or less frequent basis a predetermined amount constituting all or part of the employees compensation which amount is not subject to reduction because of variations in the quality or QUANTITY of the work performed.*

21. On February 24, 2009 in answer to a request made by Mr. Nydam a interoffice memo that answered the questions Mr. Nydam had, contained a paragraph that reads, * Any warranty repair order that is not fully paid due to part mark up error, labor time error, or something missing by the service manager when submitting the warranty repair order will be charged back to the service manager.*

22. Mr. Nydam immediately went to his supervisor and a part owner of the dealership Mr. Trampus Mansker protesting this policy.

23. Mr. Nydam told Mr. Mansker that it was sneaky and deceptive to hide this attempt at policy in an irrelevant memo.

24. Mr. Nydam also told Mr. Mansker this wasn't right and questioned the legality of such a policy.

25. Mr. Mansker then called the Mr. Hatch the company CEO, who hand wrote the following at the bottom of the memo as follows * If the chargeback is due to neglect

by the service manager I E improper flag time, processing time of claim, part called for and not returned ECT.*

26. Mr. Nydam told Mr. Mansker that he did not feel this policy was right or legal.

27. As the January 13, 2009 memo violated the code of federal regulation's title 19 Part 541 subpart G 541.602 (a) so does this memo which in effect stated wages will be reduced for sub quality work.

28. The January 13, 2009 memo, the February 17, 2009 e-mail and the February 24, 2009 memo all deal with improper wage reductions for exempt employees.

29. The code of federal regulations for exempt employees title 29 part 541 subpart G 541.603 (a) states * An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis, an actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis.

30. The factors to consider when determining whether an employer has an actual practice of making improper deductions include, but are not limited to: the number of improper deductions particularly as compared to the number of employee infractions warranting discipline: the time period during which the employer made improper deductions*

31. Mr. Nydam worked at Winslow Ford for 4 months and there was never a reason to discipline Mr. Nydam.

32. During Mr. Nydams 4 months at Winslow Ford there were 7 deductions made for a total of 2614.93.

33. Mr. Nydam protested all of these deductions.

34. Title 29 part 541 of the code of federal regulations Subpart G 541.603(c)* Improper deductions that are isolated or inadvertent will not result in the loss of the exemption for any employees subject to such improper deductions if the employer reimburses the employees for such improper deductions* Mr. Nydam was never reimbursed.

35. In Title 29 part 541, Subpart G 541.603 (d) * If an employer has a clearly communicated policy that prohibits the improper pay deductions specified in title 29 part 541, Subpart G 541.602 (a) and includes a complaint mechanism, reimburses employees for any improper deductions and makes a good faith commitment to comply in the future, such employer will not lose the exemption for any employees UNLESS the employer willfully violates the policy by continuing to make improper deductions after receiving employee complaints*

36. Winslow Ford has no policy prohibiting these deductions, Winslow Ford has no complaint mechanism in place and Winslow Ford continued making the deductions after receiving Mr. Nydams complaints.

37. Subpart G 541.603 (d) continues * If an employer fails to reimburse employees for any improper deductions or continues to make improper deductions after receiving employee complaints the exemption is lost during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions,* Further on Subpart G 541.603 (d) continues with * And whether the employer has a clearly communicated policy permitting or prohibiting improper deductions. The best evidence of a clearly communicated policy is a written policy that was distributed to employees prior to the improper deductions by, for example ,providing a copy of the policy at the time of hire, Publishing the policy in an employee handbook, or publishing the policy on the employers intranet*

38. Mr. Nydam did not receive at the time of hire any notice of the intent to make these deductions. Winslow Ford has a policy that Mr. Nydam signed at the time of hire that reads as follows,

Pay Deduction Authorization

In consideration of Winslow Ford Inc. EXTENDING CREDIT to me, I hereby agree, authorize and direct that upon TERMINATION of my employment whether voluntary or not the amount of goods or merchandise sold, services performed, loans

or advancement, or any other lawful claim by my employer against me may be set off against, deducted and withheld from any and all sums due and owed me. I agree to accept the balance remaining in full payment for all services performed.

39. Winslow Ford's position is that this is a blanket deduction policy, yet there is a separate form authorizing deduction's to pay an insurance deductible if an employee damages a customer's car.

40. There are also separate forms for deductions for health care premiums.

41. The January 13, 2009 and the February 24, 2009 memos or attempts at policy are not clear but vague to the point that the CEO had to come down and try to hand write an explanation.

42. There is no mention of an improper payroll deduction in the company's employee handbook.

43. The question also arises pertaining to these attempts at policy does the February 24, 2009 memo replace the January 13, 2009 memo?

44. Does the hand written explanation replace the typed February 24 2009 memo?

45. The January 13, 2009 memo is addressed to all 4 stores owned by the corporation whereas the February 24, 2009 memo is only addressing the Winslow Ford store, is this policy then specific to Winslow?

46. The January 13, 2009 memo is contradicted by the February 24, 2009 memo in that the January 13, 2009 memo states managers are responsible for all actions in their department and will be held accountable for their respective department and any error in that managers department will be charged back to the manager of that department.

47. The February 24, 2009 memo states that any errors will be charged back to the service manager or tech.

48. The February 24, 2009 memo then states that if there is an error in the parts pricing the service manager will be charged back not the parts manager.

49. As the FLSA points out the policy must be clearly communicated, this could


mean two things. First, that the policy is communicated, so that all employees are aware of the policy, and second, that the policy is clear in its meaning so there is no question as to what the policy is.

50. In this case the memo that came out in January a week after Mr. Nydam started was never shown to Mr. Nydam.

51. Then the February 24, 2009 memo was changed by a handwritten explanation.

52. Obviously there is not a clearly communicated policy but three different versions pertaining to improper wage deductions for only managers of certain departments which contradict each other.

53. The three versions raise more questions than answers regarding the policy.

54. In addition to the federal code of regulations for exempt employees Title 29 Part 541 the state of Arizona Rev. Stat 23-350 (5) states an employer may not deduct from an employee's wages unless,

   1 The employer is required or empowered to do so by state or federal law.

   2 The employer has prior written authorization from the employee (or)

   3 There is a reasonable good faith dispute as to the amount of wages due including the amount of any counter claim or any claim of debt, reimbursement, recoupment or set off by the employer against the employee.

55. The only pay deduction authorization that Mr. Nydam authorized are his taxes, the deduction from his wages if credit is extended to him, and paying the insurance deductible should Mr. Nydam damage a customer's car.

56. Also every time Mr. Nydam protested a pay deduction he was never told that the pay deduction authorization he had signed prior to employment which reads * In consideration of Winslow Ford Inc. EXTENDING credit to me. I hereby agree, authorize and direct that upon TERMINATION of my employment whether voluntary or not, the amount of goods or merchandise sold, services performed, loans or advancement, or any lawful claim by my employer against me, may be set off against, deducted and withheld from any and all sums due and owed me. I agree to

accept the balance remaining in full payment for all services performed,* Would be the instrument authorizing the improper deductions.

57. Mr. Nydam did not sign, agree or authorize any of the deductions from his pay to cover the cost or shortfalls in his department.

58. Sometime in April 2009 an employee under Mr. Nydams supervision wrote a repair order to repair a vehicle.

59. The employee wrote that the vehicle was covered under the manufacturer's warranty and the vehicle was repaired under warranty.

60. After the repair was done Mr. Nydam submitted the claim to the manufacturer for payment.

61. Mr. Nydam received notice back from the manufacturer that the vehicle had what was known as a branded title, ( A branded title means at some point in history the vehicle had been totaled by the insurance company and then had been rebuilt) The branded title voided all warranty on the vehicle.

62. Mr. Nydam immediately told Mr. Mansker about this and told Mr. Mansker he would contact the vehicle owner to see if the owner would pay for the repairs.

63. Mr. Nydam did call the owner of the vehicle in question and left a voice mail message for the owner to call him.

64. A day later Mr. Nydam received an interoffice e-mail from Mr. Mansker which read,

* Jerry here is how I want the repair order handled. You know you are responsible for getting our warranties paid. I do not want to go about it the wrong way however we do not have a leg to stand on without a signed repair order. I know you said Ed was the service writer but you are responsible for his actions. I have thought long and hard about this one and I don't see any way of us getting paid on this repair order so here is how I want to handle this. I want to account receivable this amount out of your check and if you get it paid I will reimburse you 100% right back. I know you understand.*

65. There is no policy by Winslow Ford that states a manager is responsible for an employee's actions.

66. The January 13, 2009 memo states in part * The service and the parts manager are responsible for all actions of the service and parts departments and will be held accountable for that department*

67. This memo does not mention a manager is responsible for an employee's actions.

68. The date on the e-mail is May 4, 2009 the pay period had ended May 2, 2009.

69. On May 6, 2009 Mr. Nydam received his pay check in a zero amount, This was neither an initial week of employment nor a terminal week of employment as defined in Title 29 Article 541 541.602 (6).

70. Mr. Nydam went and spoke with Mr. Mansker to protest again.

71. Mr. Nydam again told Mr. Mansker that this wasn't right and not legal.

72. Mr. Nydam told Mr. Mansker he would call Mr. Hatch the company CEO to try to straighten this out.

73. Mr. Mansker told Mr. Nydam that he Mr. Mansker was the general manager and part owner and his decision stood.

74. Mr. Nydam then told Mr. Mansker since the amount would be paid back if Mr. Nydam was able to get the customer to pay the amount Mr. Nydam considered this a loan to Winslow Ford and Mr. Nydam would be charging interest on the $1994.00 until it was paid to Mr. Nydam.

75. Mr. Nydam also told Mr. Mansker a zero paycheck was illegal, Mr. Mansker became very angry at Mr. Nydam for protesting this illegal act and for standing up for Mr. Nydams right's to expect a paycheck for work performed.

76. Mr. Mansker told Mr. Nydam "we should part ways".

77. Mr. Nydam took this statement from Mr. Mansker as meaning he was fired.

78. Mr. Nydam sent Mr. Hatch the company CEO, an E-Mail telling Mr. Hatch what happened and asking Mr. Hatch to call.

79. Mr. Hatch did not reply so Mr. Nydam then concluded he had been fired.

80. Winslow Ford says Mr. Nydam resigned his position, regardless of whether Mr. Nydam was fired or resigned when Mr. Mansker stated "we should part ways" after Mr. Nydam's objections to Winslow Ford's policy of improper wage reductions and the zero paycheck, Mr. Mansker was changing the compensation, terms and conditions of Mr. Nydams employment because Mr. Nydam objected to a policy Mr. Nydam reasonably believed to be in violation of the FLSA.

81. FLSA section 218 (c) 2 and 5 states * No employer shall discharge or in any other manner discriminate against any employee with respect to his or her compensation, terms, conditions, or other privileges of employment because the employee has (2) provided, caused to be provided or is about to the employer ,the Federal Government, or the attorney general of a state information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of, any provision of this title ( or an amendment made by this title) and then (5), OBJECTED to, or refused to participate in, any activity, policy, practice or assigned task that the employee reasonably believed to be in violation of any provision of this title (or amendment) or any order, rule, regulation, standard, or ban under this title ( or amendment)*.

82. Mr. Mansker by refusing to at least pay minimum wage after Mr. Nydam's objection to the zero pay changed Mr. Nydams compensation and the terms of Mr. Nydams compensation which was to be a predetermined amount on a bi weekly basis.

83. Mr. Mansker by stating "we should part ways" was a retaliatory statement that if not a termination statement certainly carried the threat of being fired if the objections continued, or if Mr. Nydam would not participate in the violation of the FLSA.

84. This statement then changed the conditions of employment for Mr. Nydam in that it became a hostile work environment.

85. This last act by Winslow Ford also violates the Fair Labor Standards Act Section 206 (a) 1 (c) Which states * Every employer shall pay to each of his employees who

in any work week is engaged in commerce or in the production of goods for commerce or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates* ( Which in this case for a nonexempt employee from overtime or minimum wage is at least $6.55 per hour) or in the case of an exempt employee from over time per title 29 Part 541 of the code of federal regulations Subpart G 541.600, An employee must be compensated on a salary basis at a rate of not less than $455.00 per week.

86. Further the U S Department of labor Fact Sheet # 16 which addresses deductions states in part. * Employees may not be required to pay any of the cost items if, by so doing their wages would be reduced below the required minimum wage or overtime compensation. This is true even if an economic loss is suffered by the employer is due to the employee's negligence.*

87. Mr. Nydam was told "we should part ways" in retaliation for protesting these illegal acts of reducing his wages without his consent or authorization and pointing out that a zero paycheck is illegal, thus a violation of the FLSA.

88. An oral complaint about an employer's compliance with the Fair Labor Standards Act can trigger the retaliation protections of the FLSA.

89. The Supreme Court has ruled In Kasten v Saint-Gobain performance plastic Corp In a majority opinion written by Justice Breyer held that if an employee's oral Complaint is " Sufficiently clear and detailed for a reasonable employer to understand it in light of both content and context as an assertion of rights protected by the statute " it can trigger the anti-retaliation protections of the FLSA.

90. Winslow Ford is well aware of the Fair Labor Standards Act because in the employee hand book given at the time of hire on page 11 the hand book states * Federal wage and hour laws will be adhered to at all times. Employees covered by the Federal wage and hour laws (Fair Labor Standards Act) must be paid time and one half for hours worked beyond 40 hours worked in one week. Personnel who are classified as exempt do not qualify for overtime compensation.*

91. Winslow Ford's owner's being aware of the FLSA deliberately misclassifies managers not only at its Winslow Arizona location but at all other stores owned by the corporation to avoid paying overtime and associated taxes.

92. Not paying overtime is a violation of 29 U.S.C sec 207 (a) (1).

93. Clearly with the reductions of pay to managers, the managers that work for Winslow Ford and this corporation are not exempt from overtime but rather non-exempt and should be paid for overtime.

94. The department of Labor Wage and Hour Division, states, * The general rule is that an employee who is subject to impermissible reductions in salary is no longer paid on a salary basis, and is therefore nonexempt.*

95. There are other managers and employees and former employees of Winslow Ford and the other dealership location's owned by this corporation that have been improperly compensated in violation of the FLSA.

96. Winslow Ford's failure to compensate Mr. Nydam in violation of the FLSA was willful as shown by Winslow Ford's knowledge of the FLSA by including the act in the employee handbook, and continuing to make improper deductions without having a clearly communicated policy permitting these deductions.

97. Continuing to make improper deductions despite Mr. Nydams complaints of this Policy as described in title 29 part 541 Subpart G 541.603 (d) and finally in violating 206 (1) b and title 29 part 541 Subpart G 541.600 by blatantly and willfully violating the minimum wage provision of the FLSA.

98. Despite Mr. Nydam's warning to management that the policy is illegal the policy continues to this day per Mr. Nydam's last conversation with company CEO Mr. Hatch in February 2012.

99. Winslow Ford continues to willfully violate the FLSA and Arizona law by refusing to pay Mr. Nydam for work performed and wages improperly withheld.

100. At all times material to this action Winslow Ford Inc. was an enterprise engaged in commerce as described 29 U.S.C 203 (b).

101. Per Article 29 U.S.C 218c. (a) And 29 U.S.C 215 (a) 3 Mr. Nydam is protected from retaliation, yet for standing up for his rights and informing his employer that the wage reductions and zero paycheck are illegal Mr. Nydam was told "we should part ways", and Mr. Nydam was discriminated against by having his compensation changed, plus the terms and conditions of his employment.

102. After Mr. Nydam parted ways with Winslow Ford he was further retaliated against.

103. In Mr. Nydam's final paycheck an amount was deducted to cover a repair order that according to Winslow Ford Inc. had not been submitted to Ford Motor Company in time and therefore would not be paid.

104. Since Mr. Nydam was no longer employed he was not able to communicate with the manufacturer to get payment on this claim.

105. In April 2011, in response to a request for Mr. Nydams personnel file was discovered a written account of the events of Mr. Mansker's and Mr. Nydam's last meeting. In this written account Mr. Mansker wrote this sentence, * Jerry wanted to fraudulently claim that work to another vehicle. * There is no truth or evidence to support that statement.

106. When a service manager also inputs warranties to the manufacturer this becomes a position of trust, much like an accountant.

107. If a prospective employer learns there may be a question about the moral character of a person in this position, that employer will continue his search for a suitable employee.

108. Mr. Mansker mailed this false statement at least once.

109. While Mr. Nydam cannot say with certainty this information ever made it to any prospective employer's, it is clear Mr. Mansker would not hesitate to mail it. The fact this is in Mr. Nydam's file at all is retaliation at its worst.

110. There may be times where someone in Human Resources would also send it without Mr. Mansker's knowledge.

111. The department of Labor fact sheet 77a which talks about retaliation states in part *Section 215 (a) (3) Prohibits "any person" from retaliation against "any employee" the protection applies to all employees of an employer even in those instances in which the employees work and the employer are not covered by the FLSA*. The section goes on,* this also applies in situations where there is no current employment relationship between the parties. For example, it protects an employee from retaliation by a former employer.*

112. Winslow Ford is in violation of 29 U.S.C 207 (a) (1)for deliberately misclassifying managers to avoid paying overtime.

113. Winslow Ford is in violation of 29 U.S.C 206 (a) 1 (b) by not paying at least minimum wage.

114. Winslow Ford is in violation of Arizona Rev. Stat 23-350 (5) by with-holding pay from an employees pay without prior written authorization.

115. And finally in violation of 29 U.S.C 218 (a) and 29 U.S.C 215 (a) 3 by retaliating and discriminating against Mr. Nydam and continuing to retaliate after Mr. Nydam was no longer employed.

116. Mr. Nydam in all his years of work has never been fired from a job.

117. The loss of income was financially damaging but the emotional damage to Mr. Nydam and his family was devastating.

## FIRST CLAIM FOR RELIEF

118. WHEREFORE Mr. Nydam pursuant to 216 (b) of the FLSA prays for the following relief.

119. That Mr. Nydam, be awarded damages, in the amount of his respective unpaid compensation, all overtime worked, wages lost and liquidated damages pursuant to 29 U.S.C 216 (b), amount to be demonstrated at trial.

120. For enforcing his rights Mr. Nydam is protected from retaliation per 29 U.S.C 218c (a) and 29 U.S.C 215 (a) 3, and because Winslow Ford Inc. did retaliate by telling Mr. Nydam " we should part ways" changing his compensation, terms,

conditions of employment, and then retaliating after the employment relationship was terminated Mr. Nydam is seeking damages for emotional distress as well as punitive damages.

121. In Tenn. Coal. Iron & R.R v Muscoda No. 123,321 U.S 590, 64 S.Ct 698.88 L.Ed. 949 (1944) To ensure compliance with the provisions enacted to serve this purpose, Congress " chose to rely on information and complaints from employees seeking to vindicate rights claimed to have been denied" Id, It included the ant-retaliation provision in recognition of the fact that " fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions" Id. In light of these objectives the Supreme Court has consistently held that the FLSA "must not be interpreted or applied in a narrow grudging manner". We likewise recognized in Ball that where statutory language permits " we are instructed to read the FLSA to effect its remedial purposes" 228 F.3d at 363-64.

122. That Mr. Nydam's reasonable attorney's fees including the costs and expenses are paid by Winslow Ford per FLSA 216 (b) amount to be demonstrated at trial.

123. An injunction ordering the defendant to cease its violations of 215 (a) 2 per article 217 of the FLSA.

124. Mr. Nydam demands a jury trial.

*/s/ Gerald J. Nydam*

By Gerald (Jerry) Nydam

416 N Berry

Winslow Arizona 86047

Pro se